# In the United States Court of Federal Claims

No. 07-698T and No. 07-704T
CONSOLIDATED
(Filed: January 6, 2014)

| | |
|---|---|
| _____ )<br><br>GENE H. YAMAGATA, )<br> )<br>and, )<br> )<br>MAUGHAN, et al., )<br> )<br> Plaintiffs, )<br> )<br>v. )<br> )<br>THE UNITED STATES, )<br> )<br> Defendant. )<br>_____ ) | **Kintner Regulations; 26 C.F.R. §§ 301.7701–1 to –3 (1996); classification of organization as corporation or partnership for tax purposes; Substantial Variance Rule.** |

*Merwin D. Grant*, Phoenix, AZ, for plaintiff Gene H. Yamagata. *Tim A. Tarter*, Phoenix, AZ, for plaintiffs Rex Maughan and Ruth Maughan.

*Jason Bergmann*, Tax Division, U.S. Department of Justice, Washington, DC, with whom were *Kathryn Keneally*, Assistant Attorney General, and *David I. Pincus*, Chief, Court of Federal Claims Section, for defendant.

**O P I N I O N**

**FIRESTONE**, *Judge.*

This consolidated tax case turns on whether Forever Living Products Japan

("FLPJ")[1] was properly characterized as an "association," and thus correctly taxed as a

---

[1] FLPJ, which is the Japanese affiliate of the U.S-based Forever Living Products Group, is in the business of importing, manufacturing, and distributing aloe vera-based cosmetic, health and

corporation under the Internal Revenue Code ("IRC") for the 1991-1996 tax years. Plaintiffs Rex Maughan ("Maughan") and Ruth Maughan, husband and wife ("the Maughan's), and Gene Yamagata ("Yamagata"), both 50% stockholders,[2] treated FLPJ as a corporation when they initially filed their returns for tax years 1991 through 1996. Plaintiffs now claim that agreements into which they entered during the early 1990s effectively transformed FLPJ into a partnership, and that their original filings as a corporation had therefore been in error. Such a reclassification would lead to a significant adjustment in the amount of taxes owed by the plaintiffs for the relevant tax years.[3] Yamagata's five-count complaint seeks a tax refund in the amount of $9,753,274,[4] plus costs, fees, and interest as allowed by law. The Maughans' six-count complaint seeks a tax refund in the amount of $36,738,362,[5] plus costs and interest as allowed by law.

---

nutritional products such as juice, lotion, and jelly, as well as bee pollen, bee propolis, and honey. Consolidated Statement of Undisputed Facts ("Consol. Facts") ¶ PPF 6.

[2] At all times relevant to the litigation, Maughan and Yamagata have owned, either directly or through their respective Subchapter S holding companies, all of the outstanding shares of FLPJ.

[3] As explained in the Maughans' administrative refund claim, the "refunds result from the additional foreign tax credits available to the U.S. owners of the FLPJ pass-through entity, from a single level of taxation, and from the tax rate arbitrage between Japan and the United States." Stipulation of Facts, ECF Nos. 78-79 ("1st Stip."), Ex. 34 at 4.

[4] Specifically, Count 1 of Yamagata's complaint seeks $609,804 for the 1991 tax year; Count 2 seeks $1,887,187 for the 1992 tax year; Count 3 seeks $2,936,531 for the 1993 tax year; Count 4 seeks $2,834,044 for the 1994 tax year; and Count 5 seeks $1,485,708 for the 1996 tax year.

[5] Specifically, Count 1 of the Maughan's complaint seeks $1,021,196 for the 1991 tax year; Count 2 seeks $2,425,699 for the 1992 tax year; Count 3 seeks $4,711,256 for the 1993 tax year; Count 4 seeks $9,292,695 for the 1994 tax year; Count 5 seeks $9,863,011 for the 1995 tax year; and Count 6 seeks $9,424,505 for the 1996 tax year.

The parties agree that the treasury regulations that were in effect during the relevant tax years, the so-called "Kintner regulations," 26 C.F.R. §§ 301.7701–1 to –3 (1996), govern the proper tax treatment of FLPJ.[6]  Under these regulations, an organization is taxable as a corporation, rather than a partnership, if it exhibits at least three of the following four characteristics: continuity of life, centralization of management, limited liability, and free transferability of interests.  In this case, the parties agree that FLPJ exhibited continuity of life.  The parties disagree, however, as to whether FLPJ exhibited the remaining three characteristics.

Pending before the court are the parties' cross-motions for summary judgment as to the proper classification of FLPJ.  Based on the facts to which the parties stipulated, the court concludes that FLPJ exhibited at least three of the four relevant characteristics of a corporation during the tax years in question, and thus was properly taxable as a corporation.  The government's motion for summary judgment is therefore **GRANTED**, and the plaintiffs' cross-motion is **DENIED**.

---

[6] The Kintner regulations were promulgated following the Ninth Circuit's decision in United States v. Kintner, 216 F.2d 418 (9th Cir. 1954), in which the court held that a professional medical association was taxable as a corporation.  The applicable regulations are discussed more fully in section II of this opinion.

I.    STATEMENT OF FACTS[7]

a.  Incorporation, organization, and operation of FLPJ

FLPJ was incorporated as a Japanese <u>kabushiki kaisha</u> in 1980,[8] and began selling

aloe vera and bee-based products in Japan in 1983.  1st Stip. ¶¶ 12, 14.  On April 29,

1983, FLPJ issued share certificates to Maughan and Yamagata reflecting that each

owned 9,000 shares of the company.  <u>Id.</u> ¶ 15.  The share certificates belonging to

Maughan and Yamagata both reported a "Restriction on Assignment of Shares," as

follows: "Any assignment of shares of the Company shall require the approval of the

Board of Directors."  <u>Id.</u>  The share transfer restriction clause was registered with the

---

[7] The parties have engaged in extensive discovery and have entered into many stipulations.  The facts described herein were either stipulated to by the parties or come directly from exhibits submitted and attached to the parties' stipulated facts.  The plaintiffs and defendant previously filed with the court a Stipulation of Facts on November 7, 2012, ECF Nos. 78-79, a Supplemental Stipulation of Facts on February 22, 2013, ECF No. 86 ("2d Stip."), and a Third Stipulation of Facts on May 3, 2013, ECF No. 99 ("3d Stip.").  The parties also jointly filed a Consolidated Statement of Undisputed Facts on August 23, 2013, ECF No. 113, which incorporated the previously stipulated facts.  The parties have also submitted five statements of Japanese law.  To the extent that Japanese law materials are relevant, the court may consider them in ruling on their cross-motions for summary judgment.  <u>See</u> RCFC 44.1 ("The court's determination as to foreign law is treated as a ruling on a question of law.").

[8] A <u>kabushiki kaisha</u>, which is defined under Japanese law as a joint-stock company, has a corporate personality that is separate from its shareholders and issues shares of stock.  1st Stip. Ex. 36 at 8.  Between January 1, 1991 and December 31, 1996, in addition to being a <u>kabushiki kaisha</u>, FLPJ was a <u>dozuku kaisha</u>.  Under Japanese law, a <u>dozuku kaisha</u> is a corporation owned entirely by three or less individuals, and during the relevant period FLPJ was owned entirely by Maughan and Yamagata or by Subchapter S corporations owned by Maughan and Yamagata.  <u>See</u> 2d Stip. ¶ 2.  In 1997, the IRS amended its regulations to allow "check-the-box" treatment such that taxpayer entities could largely select how they would be taxed.  In 2000, FLPJ was re-incorporated as a <u>yugen kaisha</u>, which is characterized as a limited liability corporation.  1st Stip. Ex. 36 at 8.  Since then, Maughan and Yamagata have used the check-the-box regulations to treat FLPJ as a partnership for federal income tax purposes.

Japanese Legal Affairs Bureau's commercial registry ("commercial registry") on July 7, 1984.  Id. ¶ 19.

Consistent with Japan's Commercial Code, FLPJ's Articles of Association required its Board of Directors to include at least three directors and one statutory auditor.  See 1st Stip. Ex. 4 at 11; 1st Stip. Ex. 29 at 9; Japanese Comm. Code art. 255.  The directors and auditor were required to "be elected at a General Meeting of Shareholders by a vote representing a majority of all outstanding shares."  1st Stip. Ex. 4 at 11.  At no point during the tax years relevant to this lawsuit did FLPJ's Articles of Association require shareholder approval for decisions other than electing and compensating FLPJ's Board of Directors.  See Consol. Facts ¶ DPF 1.

There were three directors on FLPJ's Board of Directors through the end of the 1980s: Yamagata, Maughan, and Rjay Lloyd ("Lloyd"), the latter of whom was Maughan's childhood friend and an accountant and attorney for the Forever Living Products Group.  1st Stip. ¶ 16.  From at least April of 1983 through the end of the 1980s, Maughan and Yamagata were also representative directors of FLPJ.  1st Stip. ¶ 17.  As representative directors, each had the authority to act, severally, on FLPJ's behalf.  Consol. Facts ¶ DPF 2.  Beginning in 1984, Rick Toma ("Toma") served as FLPJ's administrative manager, the most senior non-shareholder, non-director employee of FLPJ.[9]  1st Stip. ¶ 18.

---

[9] Prior to 1990, Toma took directions regarding the management and operation of FLPJ directly from Yamagata, rather than FLPJ's board.  2d Stip. ¶ 3.

**b.  Litigation between Maughan and Yamagata**

In the late 1980s, a dispute arose between Maughan and Yamagata concerning the source of the aloe vera that was being purchased by FLPJ.  From the time that FLPJ began selling products in Japan until 1988, FLPJ had acquired nearly all of its aloe vera gel and other raw materials from Aloe Vera of America, Inc. ("AVA"), a Forever Living Products Group company incorporated in Texas.  1st Stip. ¶¶  8-10; Consol. Facts ¶ PPF 5.  AVA, which was owned 100% by Maughan, would ship these materials to Japan, where FLPJ would stabilize and bottle them as aloe vera juice for the Japanese market.  Id.  In 1988 or 1989, Yamagata helped form Summit Enterprises, Inc. ("Summit") to sell aloe vera products.  Id. ¶ PPF 12.  Apparently without Maughan's knowledge, Yamagata directed Toma to cause FLPJ to purchase some of its aloe vera raw materials from Summit rather than from AVA.  Id. ¶ PPF 13.  As a 65% shareholder of Summit, Yamagata benefited financially from FLPJ's purchases from Summit.  1st Stip. ¶ 23.

On January 10, 1990, Yamagata filed suit in state court in Arizona on his own behalf against Maughan, Lloyd, AVA, and others.  1st Stip. ¶ 24.  The complaint alleged claims for fraud, breach of contract, breaches of Maughan's and Lloyd's fiduciary duties as FLPJ directors, and other business causes of action.  Id.; 3d Stip. Ex. 42 at 24.  Yamagata also named FLPJ as a plaintiff and purported to sue on its behalf.  1st Stip. ¶ 24.  The litigation expanded to include, among other things, a suit by Yamagata in Tokyo district court that attempted to enjoin a scheduled FLPJ board meeting.  1st Stip. ¶ 25.  Maughan also asserted counterclaims against Yamagata in the Arizona state court suit.  Id.  One of Maughan's counterclaims contended that FLPJ's purchase of aloe vera raw

materials from Summit was improper.  Id.  Taken together, the various claims and

counterclaims addressed, among other things, various aspects of the ownership, control,

management, and operation of FLPJ.  Id.

### c. Settlement of the 1990 litigation

Maughan and Yamagata resolved their dispute through mediation, and on

December 21, 1990, Maughan, Yamagata, FLPJ, and others executed a Settlement

Agreement.  1st Stip. ¶¶ 27-28; Consol. Facts ¶ PPF 20.  The Settlement Agreement

contained twelve articles that addressed, among other things, the "Corporate Governance

of FLPJ," FLPJ's "Supply Arrangements" for aloe vera raw materials, and "Stock

Transfer Restrictions."  1st Stip. ¶ 27.

### i. FLPJ's organization and management under the Settlement Agreement

Governance of FLPJ was one of the principal items negotiated into the Settlement

Agreement.  Consol. Facts ¶ DPF 3.  The Settlement Agreement mandated that "[t]o the

maximum extent allowed by law, all decisions relating to the operation and management

of FLPJ shall be vested in and carried out by the Board of Directors."  The Settlement

Agreement called for the number of directors on the FLPJ board to be increased to five,

two of whom would be elected from candidates nominated by Maughan, and two of

whom would be elected from candidates nominated by Yamagata.  The fifth member

would be "a United States business person with at least ten years [of] experience as an

executive officer of a substantial business enterprise . . . ."  1st Stip. Ex. 6 at 3.  The

Settlement Agreement further specified that when a board vacancy occurred, the vacancy

would be filled by a director nominated by the same shareholder (i.e., Yamagata or Maughan) who had nominated the outgoing director.  Id.  In the event that the fifth directorship became vacant, the position would be filled by agreement between Yamagata and Maughan, or by a neutral committee.  See id. at 3-5.  Article 1.3 of the Settlement Agreement stated that the parties "intended" that the two directors nominated by Maughan would be himself and Lloyd; the two directors nominated by Yamagata would be himself and Toma; and that Gary Driggs ("Driggs"), one of the settlement's mediators (and a well-known Arizona businessperson) would serve as the fifth member.  1st Stip. Ex. 6 at 5.  In addition, Article 1.3 stated that the parties agreed to comply with an unsigned shareholder agreement, attached to the Settlement Agreement as Exhibit "B," in which the parties agreed to elect the aforementioned directors.

Article 1.6 of the Settlement Agreement, titled "Appropriate Corporate Changes," described how the actions called for in the Settlement Agreement would be executed:

> Concurrently with execution of this agreement, the Board shall adopt, by unanimous consent[,] the resolutions set forth on Exhibit "D" hereto, which by this reference is incorporated herein . . . .  Maughan and Yamagata, in their capacity as shareholders of FLPJ, hereby covenant and agree that they shall jointly take such action as may be required to cause the Articles of Incorporation of FLPJ to be revised to conform to the provisions of this agreement.

1st Stip. Ex. 6 at 7.  Exhibit "D" was a resolution calling for, among other things: the rescission of certain earlier resolutions passed by the board;[10] board ratification of the

---

[10] The parties have stipulated that FLPJ's management structure was briefly affected by interim agreements entered into by Maughan and Yamagata during their litigation in the early 1990s. Consol. Facts ¶ PPF 17.  The court concludes that these interim agreements need not be

Settlement Agreement; appointment of Yamagata as Vice-Chairman of the FLPJ Board

of Directors in exchange for his resignation as a representative director; and appointment

of Maughan as a representative director and the President and Chairman of the Board of

Directors, in exchange for his resignation from all other offices then held.  1st Stip. Ex. 6

at 50; Consol. Facts. ¶ DPF 4.

### ii. Settlement Agreement provisions related to share transfer restrictions, stock buy-back, and special compensation

The Settlement Agreement addressed three additional topics of relevance to the

case at bar: procedures for transferring shares of FLPJ stock to third parties, stock buy-

back procedures in the event of Yamagata's death, and special compensation to be

provided to Maughan and Yamagata.  With regard to share transfers, Article 4 of the

Settlement Agreement established procedures that provided both Maughan and Yamagata

with a right of first refusal in the event that either sought to sell their shares to a third

party.  See 1st Stip. Ex. 6 at 16.  Specifically, Article 4.2.1 stated:

> If either Yamagata or Maughan desires to sell his stock in FLPJ, the party
> desiring to sell (hereinafter the "Offeror") shall first make a written offer
> (the "Offer") to sell to the party to whom notice is given (hereinafter the
> "Offeree") all (and not less than all) of the Offeror's common stock in FLPJ
> (the "Stock").  The Offer shall specify the price and the payment terms
> which the Offeror is willing to accept for his Stock.  The written offer must
> state that it is open for acceptance for a period of thirty (30) days (the
> "Acceptance Period") and that, if accepted within that time period, the
> closing shall occur at any time designated by the Offeree but not later than
> six months from the date of the Acceptance. . . . If, by expiration of the
> closing period, the sale has not closed, [O]fferor shall then be permitted to

addressed in this opinion because they do not materially affect the court's analysis of FLPJ's
classification under the Kintner regulations.

offer his stock to third parties as herein provided.

Id. at 16-17.  If the offeree either failed to accept the offer (or failed to perform after having accepted the option), then the Offeror was free, for a period of seven months, to sell his stock to any third party at a price and on terms no more favorable than those offered to the non-selling shareholder.  See id. at 19-20.

Article 4 also required a seller to obtain a third-party purchaser's consent to comply with two additional requirements.  First, the third party was required to agree in writing not to engage in the sale of aloe vera products outside of Japan through FLPJ.[11]  Second, if Yamagata was the seller, then the third-party purchaser was required to agree to be bound by the stock buy-back provision, described below, in the event of Yamagata's death.  Id. at 20.

Article 6 of the Settlement Agreement, titled "Stock Purchase Rights," stated that in the event of Yamagata's death, FLPJ agreed to purchase, and Yamagata agreed to sell, all of Yamagata's FLPJ stock for $10,000,000.  See 1st Stip. Ex. 6 at 24-25.  The $10,000,000 purchase price was to be funded by either an insurance policy taken out by FLPJ on Yamagata, or an annuity that would be payable to FLPJ after a time period based on Yamagata's remaining 23-year life expectancy.  Id.  The agreement stated that Yamagata would be free to assign to any third party—such as a purchaser of his shares in FLPJ—all of his rights to require FLPJ to pay for such stock.  Id. at 25-26.

---

[11] Yamagata similarly agreed, under Article 5 of the Settlement Agreement, that he would not engage in the sale of aloe vera products except through FLPJ.  See 1st Stip. Ex. 6 at 22.

Yamagata also entered into an "Independent Contractor Promotion Agreement" with AVA (the "Royalty Agreement").  Under this agreement, AVA agreed to pay commissions to Yamagata (or his assigns or successors) on the sales of AVA products to FLPJ until his death or the end of 1995, whichever came later.  1st Stip. Ex. 8 at 2.  The agreement specified that "[t]he relationship between Yamagata and AVA shall be that of independent contractor."  1st Stip. Ex. 8 at 2.  The Royalty Agreement was signed by Yamagata in his individual capacity and by Maughan in his capacity as AVA's President.  1st Stip. Ex. 8 at 7.

### iii.  Shareholder and board ratification of the Settlement Agreement

On January 22, 1991, FLPJ convened an extraordinary general meeting of the shareholders at the FLPJ head office in Tokyo.  1st Stip. Ex. 9 at 1-2.  The shareholders agreed to a resolution that purported to ratify the Settlement Agreement, as well as a resolution electing Maughan, Lloyd, Yamagata, Hiro Nakao ("Nakao"), and Driggs as the five directors.[12]  The shareholders also elected certain directors as FLPJ officers.  Specifically, Maughan was elected as FLPJ's President, Representative Director, and Chairman of the Board of FLPJ.  Nakao was elected as the Resident Representative Director, "with limited responsibilities as delegated to him by Rex G. Maughan, the other representative director."  1st Stip. Ex. 9 at 2.  Consistent with the Settlement Agreement, Yamagata was not elected as a representative director.  1st Stip. Ex. 9 at 2.

---

[12] Notwithstanding the terms of the Settlement Agreement, the shareholders did not elect Toma to the Board of Directors.

Shortly thereafter, FLPJ's Board of Directors held a meeting at FLPJ's head office in Tokyo.  1st Stip. Ex. 10 at 1-2.  The board adopted a number of resolutions to implement various terms of the Settlement Agreement.  In this connection, and in part to limit his authority to direct FLPJ to undertake activities that Maughan had not authorized, the board accepted Yamagata's resignation as a representative director of FLPJ.  See 1st Stip. Ex. 10 at 3; Consol. Facts ¶ DPF 4.  The board also resolved that Nakao, as resident director, was "available as resident representative director to sign legally on behalf of the company on any documents required in the ordinary course of business and other items specifically authorized by Mr. Maughan."  1st Stip. Ex. 10 at 6-7.  Toma, who remained as FLPJ's managing director, was instructed to "report directly to Rex Maughan as chairman of the board."  Id.  The board resolved that "any extra-ordinary expense outside the course of the day-to-day running of the company shall be brought before the Board for approval until such time as a budget can be established."  Id. at 5.

### d.  Subsequent amendments to the Settlement Agreement and related agreements

In September and October of 1992, Maughan and Yamagata executed a First Amendment to the Settlement Agreement ("Settlement Amendment"), a Buy-Sell Agreement, Escrow Instructions, and a Letter Agreement.  Under the new agreements, Maughan and Yamagata agreed to: (1) transfer ownership of their FLPJ shares to two newly-formed Subchapter S corporations (i.e., Yamagata Holding Co., Inc. and Maughan

Holding Co., Inc.);[13] (2) form a new company, Aloe Sales, Inc. ("ASI"), which they owned equally, to receive the commissions AVA previously paid to them individually;[14] (3) provide that ASI, rather than FLPJ, would purchase Yamagata's FLPJ shares in the event of his death;[15] and (4) deposit Yamagata's share certificates with an escrow company with instructions not to release them unless directed by both Maughan and Yamagata.  See 1st Stip. ¶¶ 44-49, Exs. 18, 21-22.

The Buy-Sell agreement expressly incorporated Article 4 of the original Settlement Agreement, which concerned the transfer of FLPJ stock to third parties.  In particular, Section 2.3 of the Buy-Sell Agreement states:

> The parties reconfirm and/or agree to be bound by the terms and conditions of Article 4 of the December 21, 1990 Settlement Agreement . . . including inter alia those terms and conditions which allow Maughan and Yamagata the right to sell their FLPJ stock subject to rights of first refusal.
>
> Those rights of sale and of first refusal survive the transfer of FLPJ stock from Maughan and Yamagata to Maughan Holding, Inc. and Yamagata

---

[13] On October 23, 1992, the Board of Directors resolved to approve a transfer in ownership of FLPJ shares from Yamagata's and Maughan's names to their respective holding companies.  1st Stip. ¶¶ 46-48.  FLPJ's shareholder meeting minutes from 1993, 1994, 1995 and 1996 are signed by Maughan and Yamagata on behalf of their holding companies.  See 1st Stip. Ex. 23 at 3 (1993); 1st Stip. Ex. 25 at 3 (1994); 1st Stip. Ex. 27 at 4 (1995); 1st Stip. Ex. 31 at 8 (1996).

[14] According to the Letter Agreement, ASI was to serve as a "brokerage, sales, and marketing company for health products manufactured and sold by AVA."  1st Stip. Ex. 1 at 1.

[15] It appears that the decision to form ASI was, in part, due to the parties' recognition that the buy-back provision in the original settlement agreement might have been void under Japanese law.  See 1st Stip. Ex. 17 at 8-9 ("The parties have agreed, after consultation with counsel, and recognize that under Japanese law FLPJ may be unable to purchase its own stock under the conditions as set forth in the Settlement Agreement."); 1st Stip. Ex. 18 at 4.  Under the Buy-Sell agreement, ASI agreed to purchase Yamagata's life insurance policy that had previously been owned by FLPJ.  1st Stip. Ex. 21 at 6.  In a separate letter agreement, Yamagata and Maughan agreed to assign Yamagata's estate the right to receive the $10,000,000 benefit in the event of Yamagata's death.  1st Stip. Ex. 18 at 2, 4-5.

Holding, Inc., respectively.  Maughan and Yamagata, on behalf of
themselves and their holding companies, acknowledge and reconfirm that
all are bound by the terms and conditions of Article 4 of the Settlement
Agreement.

1st Stip. Ex. 21 at 3-4.

With regard to FLPJ's management, the Settlement Amendment stated that the

parties agreed that the fifth directorship on FLPJ's board, which was vacant due to

Driggs' resignation,[16] would remain vacant.  1st Stip. Ex. 17 at 2.  The Settlement

Amendment also called for Maughan and Yamagata, "in their capacity as shareholders of

FLPJ," to "jointly take such actions as may be required to cause the election of Maughan

and Yamagata as Resident Directors of FLPJ and to confirm that the only office held by

the now-serving Resident Director Hiroo Nakao is that of Director."  1st Stip. Ex. 17 at 7.

**e.  Management of FLPJ after the Settlement Agreement and Settlement
Amendment**

From 1991 through 1996, FLPJ's Board of Directors held regular meetings and

kept detailed minutes of those meetings.  Consol. Facts ¶ DPF 5.  FLPJ's Board of

Directors made numerous management decisions regarding such disparate topics as

budgeting, employee compensation, management of raw-material inventory, warehouse

rental, computer-system purchases, the lease or purchase of new office space, and the

---

[16] The exhibits to the parties' stipulated facts indicate that Yamagata, Driggs, and Nakao
successfully resisted Maughan's attempt, in June 1992, to cause FLPJ to cease compensating
Driggs as an FLPJ director.  Driggs ultimately resigned with board approval effective July 31,
1992.  See 1st Stip. Ex. 13 at 8 (meeting minutes memorializing Driggs' resignation); see 1st
Stip. Ex. 14 (letter from Maughan to Toma explaining that Driggs' directorship had not been
renewed); 1st Stip. Ex. 15 (letter to Maughan stating "Your unilateral position dismissing Gary
Driggs and suspending Board authorized payments is a breach of the agreement and is invalid
under operation of law. . . . [T]erms of compensation cannot be changed by an individual board
member, but can only be changed after appropriate notice, meeting, and action by a majority").

scheduling of company rallies.[17]  Id. ¶ DPF 6.  The Board of Directors also voted to

declare dividends.  See, e.g., 1st Stip. Ex. 24 at 13 (August 1993 vote approving interim

dividend of ¥122,222,200[18] to each shareholder); 1st Stip. Ex. 25 at 5 (March 1994 vote

approving combined ¥612,000,000[19] dividend).  By contrast, during FLPJ's shareholder

meetings, Maughan and Yamagata merely elected and decided on the compensation of

FLPJ's directors.  Consol. Facts. ¶ DPF 7.

### f.  Assessments by Japanese taxing authorities

In 1996, the Japanese National Tax Authority ("NTA") and the Internal Revenue

Service ("IRS") participated in a Simultaneous Examination of FLPJ, AVA and

Maughan.  2d Stip. ¶ 7.  Following NTA's audit, the Japanese National Tax Tribunal

("NTT") issued Correction Notices to FLPJ for its 1991-1995 tax years.  1st Stip. ¶ 61.

The Correction Notices stated that the purchase price that FLPJ paid to AVA for aloe

vera raw materials, and recorded as cost of goods sold, included commission payments to

Maughan and Yamagata.  Id. ¶ 61.  In pertinent part, the decision stated:

> [I]t is recognized that the real purpose of the payment of the subject
> commissions was to reward Maughan and Yamagata who have been the
> Petitioner's Directors from the time of the commencement of the business
> of selling aloe products . . . it is reasonable to consider that the Petitioner
> has been engaged in a series of acts in which, while Maughan and

---

[17] The parties agree that Maughan and his nominee-directors voted in accordance with
Maughan's interests, and Yamagata and his nominee-director voted in accordance with
Yamagata's interests.  Consol. Facts ¶ PPF 38.

[18] In August 1993, this equated to approximately $1,200,000.  See Oanda Currency Converter,
http://www.oanda.com/currency/converter/ (last visited January 3, 2014).

[19] In March 1994, this equated to approximately $5,800,000.  See Oanda Currency Converter,
http://www.oanda.com/currency/converter/ (last visited January 3, 2014).

> Yamagata, taking advantage of their positions in, and as main constituents of, the Petitioner and AVA, in order to disguise the subject commissions as though they were purchase prices for the products purchased from AVA, have caused AVA, the vendor, to invoice amounts with the amount equivalent to commissions added thereto . . . .
>
> . . .
>
> And this series of acts by the Petitioner, we must say, falls within Article 68, Paragraph 1 of the General Law, which provides ". . . when the taxpayer concealed or falsified all or part of the facts which should become the basis for the calculation of a tax base, etc. or tax amount, etc. of a national tax and filed a tax return on the basis of such concealment or falsification."

1st Stip. Ex. 33-B at 56.  Accordingly, the Japanese taxing authorities recharacterized FLPJ's commission payments as directors' bonuses, which were nondeductible.[20]  1st Stip. ¶ 61; 2d Stip. ¶ 9.

### g.  The instant litigation

On November 28, 2001, the Maughans jointly filed refund claims for the 1991-1996 tax years.  The IRS formally disallowed these claims on September 29, 2005.  On April 19, 2007, the Maughans filed a request for Appeals Office consideration with the Phoenix office of the IRS.  The Maughans allege that the IRS failed and/or refused to transmit the administrative file to the appeals office for settlement consideration.  Compl. ¶ 76.  The Maughans filed suit in this court on September 28, 2007.

On or about June 3, 2003 and July 27, 2003, Yamagata filed a refund claim with the IRS for tax years 1991-1994 and 1996.  The IRS formally disallowed these claims on September 29, 2005.  According to his complaint, on or about September 5, 2007,

---

[20] Plaintiffs' experts succinctly summarized the Japanese taxing authority's findings as follows: "FLPJ was used by its shareholders and their associated companies to falsify product prices, commit fraud, and to conspire against the NTA to avoid proper corporate income taxation."  1st Stip. Ex. 34 at 16.

Yamagata filed a request for Appeals Office consideration with the Phoenix office of the IRS. Yamagata alleges that the IRS failed and/or refused to transmit the administrative file to the appeals office for settlement consideration. Compl. ¶ 76. Yamagata filed suit in this court on September 27, 2007.

The parties' cases were consolidated by court order on July 21, 2008. Order, ECF No. 22. Briefing was completed August 9, 2013, and the parties filed a consolidated statement of undisputed facts on August 23, 2013. Oral argument was heard on December 9, 2013.

## II.  DISCUSSION

### a.  Standard of review for motions for summary judgment

In tax refund suits, it is ultimately the plaintiff's burden to prove the amount of the refund to which he or she is entitled to recover. United States v. Janis, 428 U.S. 433, 440 (1976). The parties have cross-moved for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). The purpose of summary judgment is to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). Put differently, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248. Even where parties have cross-moved for summary judgment, the court must evaluate each motion on its own merits,

drawing reasonable inferences against the party whose motion is being considered.

Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

### b.  Regulatory background

IRC § 11(a) imposes tax liability on "corporations," which are broadly defined

elsewhere in the code as including "associations, joint-stock companies, and insurance

companies."  IRC § 7701(a)(3) (2012).  In light of this expansive definition, Congress has

effectively conferred responsibility for further defining the term "association" to the IRS.

See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, ¶ 2.01

(7th ed. 2013).

As noted above, the parties agree that the Kintner regulations, 26 C.F.R. §§

301.7701–1 to –3 (1996), govern the appropriate classification of FLPJ for federal

revenue purposes.[21]  Under these regulations, federal law defines the characteristics by

which a business entity will be deemed to more closely resemble a partnership, a trust, or

an association.  The focus of the court's inquiry is one of resemblance, and "not whether

it is identical in all respects to a corporation."  Outlaw v. United States, 494 F.2d 1376,

1383 (Ct. Cl. 1974).  The regulations, echoing the Supreme Court's decision in Morrissey

v. Comm'r, 296 U.S. 344 (1935), identify several "major characteristics ordinarily found

in a pure corporation which, taken together, distinguish it from other organizations."  26

C.F.R. § 301.7701–2(a)(1).  These characteristics include (1) associates, (2) an objective

---

[21] The evolution of these regulations is discussed in detail in several opinions, see, e.g., Kurzner v. United States, 413 F.2d 97, 99-106 (5th Cir. 1969); Richlands Med. Ass'n v. Comm'r., 60 T.C.M. (CCH) 1572 (T.C. 1990), aff'd 953 F.2d 639 (4th Cir. 1992), and is not repeated here.

to carry on business and divide the gains therefrom, (3) continuity of life, (4) centralization of management, (5) liability for corporate debts limited to corporate property, and (6) free transferability of interests. Id.

Both corporations and partnerships possess associates and an objective to carry on business for profit. As a result, where, as here, the court is called upon to distinguish between a corporation and a partnership, the classification is based on whether the entity exhibits at least three of the remaining four characteristics: continuity of life, centralization of management, limited liability, and free transferability of interests. See 26 C.F.R. § 301.7701-2(a)(2). In making this determination:

> Although it is the Internal Revenue Code rather than local law which establishes the tests or standards which will be applied in determining the classification in which an organization belongs, local law governs in determining whether the legal relationships which have been established in the formation of an organization are such that the standards are met. Thus, it is local law which must be applied in determining such matters as the legal relationships of the members of the organization among themselves and with the public at large, and the interests of the members of the organization in its assets.

26 C.F.R. § 301.7701-1(c).

Plaintiffs have conceded that FLPJ exhibited the characteristic of "continuity of life."[22] Pls.' Cross-Mot. 10 n.21. Thus, the case turns on whether FLPJ exhibited at least two of the remaining three characteristics: centralization of management, limited liability, and free transferability of interests. Plaintiffs contend that FLPJ did not exhibit any of

---

[22] An entity exhibits continuity of life if the entity would continue to exist despite the "death, insanity, bankruptcy, retirement, resignation, or expulsion of any member." 26 C.F.R. § 301.7701-2(b)(1).

the remaining characteristics, and therefore should be classified as a partnership.  The

government contends that FLPJ exhibited all three of the remaining characteristics, and

was therefore properly taxed as a corporation.  As explained below, the court holds that

because at all relevant times FLPJ exhibited at least three of the corporate characteristics

of centralized management, limited liability, a modified form of free transferability of

interests, and the conceded characteristic of continuity of life; FLPJ was properly taxed as

a corporation.

### c.  FLPJ exhibited centralized management following plaintiffs' transfers of their FLPJ stock to their respective holding companies

The government argues that FLPJ exhibited centralized management because the

undisputed facts demonstrate that FLPJ's Board of Directors—rather than Maughan and

Yamagata in their capacity as shareholders—possessed exclusive authority to manage

FLPJ.  According to the government, the fact that FLPJ's Board of Directors included

non-shareholder members who owed fiduciary duties to FLPJ, coupled with the fact that

the board at times delegated authority to bind FLPJ to its non-shareholder representative

director, Nakao, prove that FLPJ's Board of Directors—rather than its shareholders—

centrally managed FLPJ.

Plaintiffs, in response, posit essentially two reasons for why FLPJ did not exhibit

centralized management.  First, plaintiffs assert that Maughan and Yamagata wielded de

facto control over FLPJ board decisions in order to further their own interests.  Second,

plaintiffs argue that by virtue of the plain language of a subsection of the Kintner

regulations, 26 C.F.R. § 301.7701-2(c)(1), centralized management could not exist because all of FLPJ's members (i.e., shareholders) also served on its Board of Directors.

As explained below, the court finds that during all relevant periods, FLPJ's Board of Directors possessed sole authority to make important management decisions on behalf of the company. The court, however, also recognizes the Kintner regulations' limitation on all "members" serving on the board of directors. Thus, once Maughan and Yamagata ceased to be members of FLPJ as individuals (i.e., after their 1992 transfer of FLPJ stock to their respective holding companies), the technical prohibition in the Kintner regulation no longer applied and FLPJ exhibited centralized management for the purpose of the Kintner regulations.

### i. Kintner regulations related to centralized management

With regard to centralized management, the Kintner regulations specify, <u>inter alia</u>, that:

> (1) An organization has centralized management if any person <u>(or any group of persons which does not include all the members)</u> has continuing exclusive authority to make the management decisions necessary to the conduct of the business for which the organization was formed. <u>Thus, the persons who are vested with such management authority resemble in powers and functions the directors of a statutory corporation.</u> The effective operation of a business organization composed of many members generally depends upon the centralization in the hands of a few of exclusive authority to make management decisions for the organization, and therefore, centralized management is more likely to be found in such an organization than in a smaller organization.

> (2) The persons who have such authority may, or may not, be members of the organization and may hold office as a result of a selection by the members from time to time, or may be self-perpetuating in office. . . . Centralized management can be accomplished by election to office, by proxy appointment, or by any other means which has the effect of

concentrating in a management group continuing exclusive authority to make management decisions.

(3) Centralized management means a concentration of continuing exclusive authority to make independent business decisions on behalf of the organization which do not require ratification by members of such organization.  Thus, there is not centralized management when the centralized authority is merely to perform ministerial acts as an agent at the direction of a principal.

(4) There is no centralization of continuing exclusive authority to make management decisions, unless the managers have sole authority to make such decisions.  For example, in the case of a corporation or a trust, the concentration of management powers in a board of directors or trustees effectively prevents a stockholder or a trust beneficiary, simply because he is a stockholder or beneficiary, from binding the corporation or the trust by his acts.  However, because of the mutual agency relationship between members of a general partnership subject to a statute corresponding to the Uniform Partnership Act, such a general partnership cannot achieve effective concentration of management powers and, therefore, centralized management.

26 C.F.R. § 301.7701-2(c) (emphasis added and citations omitted).

### ii. FLPJ's Board of Directors had continuing exclusive authority to make the management decisions necessary to the conduct of the business for which FLPJ was formed

Whether FLPJ exhibited centralized management within the meaning of the Kintner regulations turns on two issues: first, whether Maughan and Yamagata at all times wielded sole authority to make decisions on behalf of FLPJ, and second, whether Maughan and Yamagata's presence on the FLPJ board forecloses a finding of centralized management.  The court turns now to the first issue.

The government argues that FLPJ was centrally managed based on the following undisputed facts.  First, under Japanese law, shareholders in a kabushiki kaisha are unable to bind the company unless the company affirmatively delegates management authority

to the shareholders through the Articles of Incorporation, and here FLPJ's shareholders did not amend the Articles of Incorporation to expand shareholder control over the company's management.  Second, the Settlement Agreement reaffirmed that, "[t]o the maximum extent allowed by law, all decisions relating to the operation and management of FLPJ shall be vested in and carried out by the Board of Directors," and thus the parties agreed to be bound by the decisions of the FLPJ Board of Directors and not simply by the shareholders.  Moreover, the minutes of Board of Directors meetings held during 1991-1996 confirm that FLPJ's board in fact made FLPJ's management decisions.  Third, at all times relevant to the litigation, the non-shareholder members of FLPJ's board were of equal or greater number than the shareholder directors and therefore had the ability to block or outvote the shareholders, Maughan and Yamagata.

Plaintiffs argue that these facts do not establish that FLPJ was centrally managed because Maughan and Yamagata, as the two shareholders, possessed de facto control over all decisions of the FLPJ board such that FLPJ was effectively managed by its shareholders, rather than by its Board of Directors.  Plaintiffs assert that the court can reasonably infer de facto shareholder-control because (1) as a result of the Settlement Agreement and its subsequent amendments, any corporate action by FLPJ purportedly had to be agreed to by Maughan and Yamagata; (2) Maughan and Yamagata were free to vote their own interests, rather than the interests of the company; and (3) the decision to add an additional "fifth member" to the Board of Directors was necessary because the directors nominated by Maughan and Yamagata were not actually empowered to vote independently.

The court finds that the undisputed facts establish that FLPJ was centrally managed, and that plaintiffs have failed to put into dispute any fact to suggest otherwise. As noted above, the critical question to be answered with regard to centralized management under the Kintner regulations is whether FLPJ's Board of Directors had "exclusive authority to make independent business decisions on behalf of the organization which [did] not require ratification by the members." The court answers that question in the affirmative for the following reasons. First, plaintiffs' de facto control argument ignores both the Japanese Commercial Code and the Settlement Agreement, which not only vested FLPJ's Board of Directors with authority to make management decisions, but required that each director act as a fiduciary to the corporation. See Japanese Comm. Code, art. 260(1) (a kabushiki kaisha's board of directors "shall decide the administration of affairs of the company"). Japan's Commercial Code imposes a duty of good faith and loyalty on corporate directors to act in the interest of the company. See Japanese Comm. Code, art. 254-3 ("The directors shall be obliged to obey any law or ordinance and the articles of incorporation as well as resolutions adopted at a general meeting and to perform their duties faithfully on behalf of the company.").[23] Thus, the fact that Maughan and Yamagata nominated the directors does not mean that the shareholders controlled the Board of Directors. The non-

---

[23] The court recognizes that plaintiffs contend that Arizona law should govern the plaintiffs' relationships. Despite authority to the contrary, e.g., Gemstar Ltd. v. Ernst & Young, 917 P.2d 222, 229 (Ariz. 1996) (adopting Restatement (Second) of Conflict of Laws (1971) (law of state of incorporation generally governs internal affairs of corporation)), the court need not decide whether Arizona law applies for the purpose of this motion. Under either Arizona or Japanese law, corporate officers and directors owe an independent duty of loyalty to the company. E.g., Atkinson v. Marquart, 541 P.2d 556, 558 (Ariz. 1975).

shareholder board members were obligated to fulfill their fiduciary responsibilities to the corporation and had the ability to out-vote Maughan and Yamagata, the two shareholders.[24]   There is simply no evidence to suggest that Maughan's or Yamagata's nominee-directors were under any legal obligation to act in concert with Maughan or Yamagata.  Cf. MCA, Inc. v. United States, 685 F.2d 1099, 1104 (9th Cir. 1982) (rejecting government's control theory that rested on "the implicit assumption that, in the event of conflicting interests, the Trustees will act in derogation of their fiduciary duty").

Second, plaintiffs' argument ignores the minutes from FLPJ's director and shareholder meetings.  The record makes clear that FLPJ's board addressed significant corporate business management issues such as reviewing leases, approving dividends, and making marketing decisions.  By contrast, FLPJ's shareholder meetings served primarily to elect directors and establish director compensation.

Third, plaintiffs' argument ignores the fact that Maughan and Yamagata were not the only persons with actual control over FLPJ decision-making.  The undisputed evidence demonstrates that Nakao, a non-shareholder representative director, was at times authorized to "sign legally on behalf of [FLPJ] on any documents in the ordinary

---

[24] In this connection, the court is not persuaded that, as plaintiffs claim, that the Japanese Commercial Code permits board members of a dozuku kaisha to ignore their fiduciary duties. The plaintiffs have failed to provide any Japanese case law to support such a proposition.  The excerpt of the 1974 Japanese Supreme Court's decision relied on by the plaintiffs merely suggests that if nearly all of a corporation's shareholders agree to allow a transfer of shares, and the board of directors failed to formally approve such a transfer, that the transaction need not be voided. See 2d Statement of Japanese Law, Ex. 31B (excerpt of Saiko Saibansho [Sup. Ct.] Sept. 26, 1974, Sho 47 (o) no. 1225, 315 Hanrei Taimuzu [Hanta] 224).

course of business . . . ."[25]  1st Stip. Ex. 10 at 6-7.  Similarly, plaintiffs' argument ignores the undisputed fact that Yamagata, having resigned from the office of representative director, was stripped of authority to direct any of FLPJ's business activities or make decisions by virtue of his status as a shareholder.[26]  See Consol. Facts. ¶ DPF 4.  Rather, Yamagata was only authorized to bind FLPJ when acting through FLPJ's board in his capacity as a director.

For all of these reasons, the court finds that the undisputed facts establish that FPLJ was centrally managed by its Board of Directors for the years in question.

### iii.  26 C.F.R. § 301.7701-2(c) precludes centralized management during the period prior to plaintiffs' transfer of FLPJ stock to their respective holding companies

Although, for the reasons stated above, the court finds that FLPJ was centrally managed by its Board of Directors, this factor alone does not end the court's inquiry under the Kintner regulation with regard to centralized management.  The court now turns to plaintiffs' contention that the government was nonetheless legally foreclosed from treating FLPJ as centrally managed under the Kintner regulations, 26 C.F.R. §

---

[25] It is not legally significant that the resolution recognizing Nakao's status as a representative director expressly limited his authority to bind FLPJ to those responsibilities delegated by Maughan.  In making that delegation, Maughan and the Board of Directors were acting in their capacity as directors and/or officers of the company, rather than in their capacity as shareholders.  See 1st Stip. Ex. 10 at 6-7.

[26] The capacity (or lack thereof) of an individual stockholder to bind a business entity by virtue of his/her ownership interest is one of the quintessential traits that distinguishes partnerships from corporations.  See 26 C.F.R. § 301.7701-2(c)(4) (contrasting corporate directors' inability to unilaterally bind corporation with mutual agency relationships in general partnerships).  In this connection, Yamagata's lack of authority to bind FLPJ demonstrates that Maughan's and Yamagata's status as shareholders, without more, was insufficient to bind FLPJ.

301.7701-2(c)(1), because those regulations suggest that centralized management cannot exist if all shareholders are also on the board of directors.  Specifically, the relevant provision states, "[a]n organization has centralized management if any person (or any group of persons which does not include all the members) has continuing exclusive authority to make the management decisions necessary to the conduct of the business for which the organization was formed."  26 C.F.R. § 301.7701-2(c)(1) (emphasis added).

Here, it is not disputed that Maughan and Yamagata served on the FLPJ board at all times relevant to this case.  Nevertheless, the government contends Maughan and Yamagata's presence on FLPJ's board is irrelevant because the subject parenthetical does not apply when shareholder-directors are acting in a representative capacity (i.e., as the entity's elected officers and directors).  In support, the government primarily relies on two IRS revenue rulings and a Tax Court Memorandum.[27]  Revenue Ruling 71-574 held that a professional service organization exhibited centralized management despite being managed by a 5-member board of directors that included the sole two owners (and three vacancies).[28]  Rev. Rul. 71-574, at *2 (1971).  The second ruling, Revenue Ruling 93-6,

---

[27] In Richlands Med. Ass'n, the Tax Court held that even where all of an organization's members sit on the board of directors, such an organization will be classified as a corporation, provided that "the management group is not REQUIRED, under an organization's governing documents, to include all the members."  60 T.C.M. (CCH) 1572 (capitalization in original).

[28] The ruling states:

> [E]ven though all of the association's members happen to be members of its board of directors, i.e. the management group, at a particular time, this does not preclude the association from having centralized management, despite the parenthetical language of the regulations discussed above, since the authority to make management decisions is not vested in the entire membership as such, but in the

involved the classification of a limited liability company with five owners, each of whom was elected as a manager of the company.  Rev. Rul. 93-6 (1992).  The IRS found— consistent with Revenue Ruling 71-574—that "[a]lthough all of [the company's] members are elected managers of [the company], [the company] nevertheless possesses centralized management, because, as provided by the Act, authority to make management decisions rests solely with the five members in their capacity as managers rather than as members." Id. at *3.  The government also draws support from Helvering v. Coleman-Gilbert Assocs., a companion case to Morrissey, in which the Supreme Court held that a trust exhibited centralized management despite the fact that each of the beneficiaries were also trustees.  296 U.S. 369, 372 (1935).  Finally, the government argues in the alternative that Maughan and Yamagata's presence on the FLPJ board does not bar a finding of centralized management after October 1992, when they each transferred their shares in FLPJ to their respective holding companies and were no longer individual shareholders in FLPJ.

In response, plaintiffs argue that the above-cited revenue rulings and tax opinion are not relevant because the court is bound by the plain language of the regulations, and that under the plain language FLPJ was not centrally managed.  Plaintiffs assert that the court cannot ignore the undisputed fact that Maughan and Yamagata, either as the sole

_____

board of directors.  While the directors do have to be members of the association, all members do not have to be directors.

Rev. Rul. 71-574, 1971-2 C.B. 432 at *2.

shareholders of FLPJ or as the sole shareholders in holding companies that held all of FLPJ's stock, were also on the FLPJ Board of Directors.

In determining whether the above-quoted parenthetical language bars the court from finding centralized management, the court begins, as it must, with the text of the regulation.  Roberto v. Dep't of Navy, 440 F.3d 1341, 1350 (Fed. Cir. 2006).  Except in extraordinary circumstances, regulatory language that is clear and unambiguous ends the court's inquiry: the court must adopt the regulation's plain meaning.  Id.; but see Sebelius v. Cloer, 133 S. Ct. 1886, 1896 (2013) (court may not be bound by unambiguous language where the disposition required would be sufficiently absurd); Hall v. United States, 677 F.3d 1340, 1346 (Fed. Cir. 2012) (recognizing exception).  If an ambiguity exists, however, the agency's interpretation will be accepted if it fits within the scope of the ambiguity that the regulation contains.  Auer v. Robbins, 519 U.S. 452 (1997); Gose v. U.S. Postal Serv., 451 F.3d 831, 836 (Fed. Cir. 2006); Norfolk Dredging Co., v. United States, 375 F.3d 1106, 1110 (Fed. Cir. 2004).  Thus, prior to deferring to the government's reading of the Kintner regulations, the court must satisfy itself that the regulation contains an ambiguity.  See Coeur Alaska, Inc. v. Se. Alaska Conservation Council, 557 U.S. 261, 278 (2009).

The court concludes that the plain language of the parenthetical in section 301.7701-2(c)(1) is not ambiguous, but instead unambiguously precludes a finding of centralized management in instances when all of a company's shareholders also serve on its board of directors.  It has long been recognized that the parenthetical in section 301.7701-2(c)(1) could require that a corporation's management group exhibit some

numerical "funneling down" of its members in order to exhibit centralized management. See Eaton, Professional Corporations and Associations in Perspective, 23 Tax L. Rev. 1, 42 (1967) ("[T]he Kintner regulations added the element of numbers, indicating that the managers should consist of less than all the owners. . . . Valid or not, therefore, the test remained simple.").[29]   Therefore, because Maughan and Yamagata served on FLPJ's board, the court concludes that, as a matter of law, FLPJ did not meet the definition of centralized management for the period in which Yamagata and Maughan directly owned shares of FLPJ.

The court, however, limits its holding that FLPJ lacked centralized management to the period prior to October 23, 1992—the approximate date when Maughan and Yamagata transferred their individual shares in FLPJ to their respective holding companies.  After that date, Maughan and Yamagata did not own shares in FLPJ as individuals and were therefore not "members" of the organization within the meaning of the Kintner regulations, when they served on the FLPJ Board of Directors.  At that point, Maughan and Yamagata's presence on the FLPJ Board of Directors did not violate the limit on centralized management identified in the above-quoted parenthetical provision. Indeed, plaintiffs conceded at oral argument that after the share transfer, Maughan and

---

[29] Because the subject regulations have been upheld as valid by the Federal Circuit, Zuckman v. United States, 524 F.2d 729, 739 (Ct. Cl. 1975); Outlaw, 494 F.2d at 1386, the court is bound by them.  The court is therefore not free, as the government invites, to rewrite the Kintner regulations to conform to the Supreme Court's 1935 decision in Helvering v. Coleman-Gilbert Assocs., 296 U.S. at 372.

Yamagata lacked "direct" ownership of FLPJ.  See Oral Argument Tr. 26: 5-19,

December 9, 2013.

The court also declines plaintiffs' invitation to extend the parenthetical provision's

bar to situations where the "members" maintain an "indirect" interest in an organization.

The Federal Circuit has in the past rejected the notion of indirect or constructive

ownership in ruling on the question of centralized management.  See Zuckman, 524 F.2d

at 739.  As the Zuckman court observed, Congress and the IRS have proven adept at

making the appropriateness of a constructive ownership rule known without resorting to

inference or analogy.  Id.; see 26 U.S.C § 318 (constructive ownership rule to be applied

"[f]or purposes of those provisions of this subchapter to which the rules contained in this

section are expressly made applicable") (emphasis added).  For this reason, the court

declines to recognize Maughan or Yamagata's "indirect" interests in FLPJ stock for the

purpose of the centralized management analysis.  Therefore, although FLPJ lacked

centralized management by virtue of Maughan's and Yamagata's ownership interests in

FLPJ prior to October 23, 1992, the government is entitled to summary judgment on the

issue of centralized management after that date.

### d.  FLPJ exhibited limited liability

The government next argues that FLPJ was properly taxed as a corporation

because it also exhibited limited liability.  According to the government, the undisputed

facts demonstrate that FLPJ's corporate form protected its shareholders from a substantial

amount of personal liability for corporate debts, notwithstanding plaintiffs' theoretical

liability under various Japanese tax laws.  Plaintiffs, however, read the regulations as

stating that whenever a company's shareholders could be held personally liable for any

corporate liability arising from its acts or operation, then that company lacks limited

liability.  Plaintiffs contend that FLPJ lacked limited liability in this case because

Maughan and/or Yamagata could have been held liable under Japanese law for certain tax

debts under the "denial of transaction" rule or the "essential asset" theory.  In reply, the

government contends that the "denial of transaction" rule does not substantially impair

the limited liability enjoyed by FLPJ's shareholders.  The government attacks plaintiffs'

"essential assets" theory on similar grounds, but also argues that plaintiffs are barred

from making the essential assets argument in this court based on the variance doctrine.

As explained below, the court concludes that FLPJ exhibited limited liability

notwithstanding plaintiffs' potential liability under Japan's limited "denial of transaction"

rule, and that the court lacks jurisdiction to consider plaintiffs' "essential assets" theory.

### i.  Kintner regulations related to limited liability

With regard to limited liability, the Kintner regulations provide, <u>inter alia</u>:

> An organization has the corporate characteristic of limited liability if under
> local law there is no member who is personally liable for the debts of or
> claims against the organization.  Personal liability means that a creditor of
> an organization may seek personal satisfaction from a member of the
> organization to the extent that the assets of such organization are
> insufficient to satisfy the creditor's claim.  A member of the organization
> who is personally liable for the obligations of the organization may make
> an agreement under which another person, whether or not a member of the
> organization, assumes such liability or agrees to indemnify such member
> for any such liability.  However, if under local law the member remains
> liable to such creditors notwithstanding such agreement, there exists
> personal liability with respect to such member.

26 C.F.R. § 301.7701-2(d)(1).

### ii.  The "denial of transaction" rule does not impair FLPJ's limited liability for the purposes of the Kintner regulations

Plaintiffs contend that a company lacks limited liability within the meaning of the Kintner regulations if, under local law, its shareholders could be held personally liable for any corporate debts under a given set of circumstances.  Plaintiffs then argue that FLPJ lacked limited liability because Maughan and/or Yamagata could have been held personally liable for certain tax debts under the "denial of transaction" rule.  According to plaintiffs, this rule allows Japanese tax offices to recharacterize a closely-held corporation's[30] accounting practices where those practices would unduly reduce the company's tax burden.  Pls.' Cross-Mot. 34.  In such a situation, Japanese tax law provides that the corporate members benefitting from such transactions can be liable for profits received to the extent of any uncollected company tax.  See 1st Stip. Ex. 39 at 16.  Plaintiffs argued to the IRS that the Japanese taxing authorities recharacterized as non-deductible bonus payments the commissions paid to Maughan and Yamagata for sales of aloe vera products.  1st Stip. Ex. 34 at 14.

The government views plaintiffs' theoretical liability under a "denial of transaction" rule as not germane to the limited liability analysis under the Kintner regulations.  As noted above, the government contends that the undisputed facts demonstrate that FLPJ's corporate form shielded its shareholders from a substantial amount of corporate liability, and therefore FLPJ exhibited limited liability for the

---

[30] The court refers to closely-held corporations for ease of reference; however the "denial of transaction" rule actually applies to dozuku kaishas, which are companies in which at least 50% of the shares are owned by three or fewer shareholders.  See 2d Stip. ¶ 2.

purpose of the Kintner regulations.  In support, the government relies on the general rule of limited liability found in Article 200(1) of Japan's commercial code,[31] as well as several cases that found limited liability under the Kintner regulations notwithstanding the existence of residual shareholder liability in certain circumstances.  The government also seizes on a concession by plaintiffs' experts that Maughan and Yamagata, solely by virtue of their status as shareholders, could not be held liable under Japanese law for torts or breaches of contract committed by FLPJ.[32]

The court finds plaintiffs' arguments concerning Maughan's and Yamagata's liability under a "denial of transaction" theory to be unpersuasive.  Under the Japanese Commercial Code, the liability of a shareholder in a <u>kabushiki kaisha</u> is limited to the value at which he has taken his shares.  Japanese Comm. Code art. 200(1).  Indeed, plaintiffs' expert conceded that without more, plaintiffs' status as shareholders would be insufficient to render Maughan or Yamagata liable for FLPJ's torts or other debts.  <u>See</u> Def. 1st Decl. Ex. 6, 83:5-10.  Thus, it is clear that FLPJ's shareholders, as a general matter, could not be held liable for most corporate debts merely due to their status as shareholders.  This is the essence of limited liability under the Kintner regulations.

The fact that plaintiffs could have been held liable for certain tax debts under a "denial of transaction" rule—which is premised on their <u>individual</u> <u>participation</u> in a

---

[31] Article 200(1) states, "the liability of a shareholder [in a <u>kabushiki kaisha</u>] shall be limited to the value at which he has taken his own shares."  1st Statement Jap. Law. Ex. 2 at JA 49.

[32] For example, plaintiffs' expert, Kenju Watanabe, stated that he was unaware of any party other than the Japanese taxing authorities that could have sought satisfaction from FLPJ's shareholders to the extent that FLPJ's assets were insufficient to satisfy their claims.  Def. 1st Decl. Ex. 6, 87:8-13.

scheme to defraud the Japanese government of tax revenues—does not eliminate the

substantial limitation of liability to shareholders found in Japan's Commercial Code.  On

that point, the court finds as particularly persuasive the reasoning in the Fifth Circuit's

decision, Kurzner, 413 F.2d at 104 (5th Cir. 1969).  In reviewing the approach to limited

liability contemplated in the Morrissey decision that preceded the Kintner regulations, the

Fifth Circuit noted that:

> The [Supreme] Court does not say that shareholders are not personally
> liable for their acts, for they certainly are in many instances when they
> personally act on behalf of the corporation.  The concept of limited liability
> does not exist as an ideal form above and apart from its legal and economic
> setting.  The corporate form permits the limitation of liability but, for rather
> obvious reasons, an active participant cannot claim the same protection as a
> mere investor.

Kurzner, 413 F.2d at 104.  The Fifth Circuit went on to hold that, "[a]lthough a

shareholder-employee must necessarily be responsible for his misconduct, the corporate

form nonetheless shields the shareholder from a considerable amount of contractual and

tort liability."  Id. at 108; accord O'Neill v. United States, 410 F.2d 888, 898 (6th Cir.

1969) (preserving personal liability of medical professionals not inconsistent with limited

liability); Richlands Med. Ass'n., 60 T.C.M. (CCH) at 1587-88.  Based on this same

reasoning, the court agrees with the government that the "denial of transaction" rule does

not impair FLPJ's limited liability under Japanese law for the purpose of the Kintner

regulations.  If the theoretical ability of a creditor to reach a shareholder in a single

circumstance is sufficient to eliminate limited liability for the purpose of the Kintner

regulations, then it is unlikely that any closely-held corporation—particularly in a

jurisdiction that allows for piercing the corporate veil—could ever be said to exhibit

limited liability.  The court declines to adopt such an approach, and therefore finds that FLPJ exhibited the corporate characteristic of limited liability.

### iii.  The court lacks jurisdiction to consider plaintiffs' "essential assets" theory

Plaintiffs also contend that FLPJ lacked limited liability because under Japanese tax law, a person who provides an essential asset to a company in which that person owns shares can be held liable for the company's delinquent taxes up to the value of (or amount of profits earned by) that asset.  Plaintiffs' experts assert that an asset will be considered essential if it is "related to the business of the company to such a degree so that, but for such asset, the business of [the] company would become, or be exposed to the risk of becoming impossible."  1st Stip. Ex. 37 at 15 (citing Article 37(1) of the National Tax Collection Act Basic Circulars).  Plaintiffs contend that AVA and the aloe vera that AVA supplied to FLPJ constituted essential assets.

The government argues that plaintiffs are barred from presenting their "essential asset" theory due to what is known as the "substantial variance" rule.  Specifically, the government argues that (1) plaintiffs' administrative refund claims never raised an "essential assets" theory as a basis for claiming that FLPJ lacked limited liability, and (2) the underlying facts supporting this theory differ substantially from those presented at the administrative stage.

Plaintiffs conceded during oral argument that they failed to provide in their administrative claim or protest any facts to show that AVA aloe vera was "essential."  See Oral Argument Tr. 55:1-6, December 9, 2013.  Nevertheless, plaintiffs assert that the

substantial variance rule is inapplicable because their "essential assets" theory did not

actually constitute a new theory for relief.  In support, plaintiffs note that their initial

refund claims asserted that FLPJ lacked limited liability under local (i.e. Japanese) law,

and the "essential assets" theory is a component of Japanese law.  In the alternative,

plaintiffs suggest that the argument that FLPJ lacked limited liability under an "essential

assets" theory is the equivalent to arguing that FLPJ lacked limited liability under a

piercing the-corporate-veil theory, which plaintiffs timely raised in their administrative

tax refund proceedings.  As discussed below, the court concludes that plaintiffs are barred

from presenting their "essential assets" theory because it varies substantially from the

claims presented at the administrative stage.

IRC § 7422 and 26 C.F.R. § 301.6402-2[33] combine to create the substantial

variance rule.  Put simply, a taxpayer is barred from presenting claims in a tax refund suit

that substantially vary the factual bases and legal theories that were set forth in the tax

refund claim presented to the IRS.  See Cencast Servs., L.P. v. United States, 729 F.3d

1352, 1367 (Fed. Cir. 2013); Lockheed Martin Corp. v. United States, 210 F.3d 1366,

---

[33] Section 301.6402-2(b)(1) provides, in relevant part:

> No refund or credit will be allowed after the expiration of the statutory period of limitation applicable to the filing of a claim therefor except upon one or more of the grounds set forth in a claim filed before the expiration of such period.  The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof.

26 C.F.R. § 301.6402–2(b)(1).

1371 (Fed. Cir. 2000).  With regard to the legal component, "[a]ny legal theory not

expressly or impliedly contained in the application for refund cannot be considered by a

court in which a suit for refund is subsequently initiated."  Lockheed Martin Corp., 210

F.3d at 1371 (quoting Burlington N. Inc. v. United States, 684 F.2d 866, 868 (Ct. Cl.

1982); see also Ottawa Silica Co. v. United States, 699 F.2d 1124, 1139 n.6 (Fed. Cir.

1983) (court may treat issue first raised at the trial stage as part of the initial

administrative claim if "derived from or is integral to the ground timely raised in the

refund claim").  The purpose of the substantial variance rule is threefold: (1) to provide

the IRS notice as to the nature of the claim and the specific facts underlying the claim; (2)

to provide the IRS with an opportunity to correct any errors; and (3) to limit "any

subsequent litigation to those grounds that the IRS had an opportunity to consider and is

willing to defend."  Lockheed Martin Corp., 210 F.3d at 1371.

In their appeals protest to the IRS, Rex and Ruth Maughan contended that FLPJ

lacked limited liability because: "[u]nder limited circumstances, Japanese law would

have allowed the [NTA] of Japan . . . to collect FLPJ's corporate income tax deficiencies

from the 1991 through 1996 audit from its shareholders if the company had been unable

to borrow the funds to fully pay the audit assessments."  1st Stip. Ex. 34 at 5.  The

Maughans' administrative appeal then argued that the NTA's 1996 audit, which resulted

in the recharacterization of commission payments made to Maughan and Yamagata,

"provides the factual predicates for the NTA to pierce the FLPJ corporate veil and to

collect the tax liabilities from Maughan and Yamagata (if FLPJ had not been able to

borrow the funds to pay the tax liability assessments)."  Id. at 15-16.

The court concludes that these statements did not provide the IRS with either express or implied notice of plaintiffs' "essential assets" legal theory.  The federal regulations that form the bases of plaintiffs' refund claims expressly rely on the application of local law to determine the legal relationships among members of an organization and with the public at large.  26 C.F.R. § 301.7701-1(c).  It follows, therefore, that plaintiffs were obligated to provide the IRS with adequate notice of the specific local law theories on which their refund claims are based.  Plaintiffs' "essential assets" theory, however, was neither a subsidiary of, nor integral to, the specific theories actually placed before the IRS: the "denial of transaction" rule and "piercing the corporate veil."  See Ottawa Silica Co., 699 F.2d at 1139.

Moreover, the factual predicate of plaintiffs' "essential assets" theory was never presented to the IRS.  The determination of whether or not AVA's supply of aloe vera was actually "essential" is a question of fact, which plaintiffs concede was not addressed anywhere in the Maughans' administrative claim.  To allow plaintiffs' to proceed on this ground would be inconsistent with the goal of limiting "any subsequent litigation to those grounds that the IRS had an opportunity to consider and is willing to defend." [34]

Lockheed Martin Corp., 210 F.3d at 1371.  Thus, because the court concludes that the

---

[34] Plaintiffs' reliance on Estate of [Liftin] v. United States, 111 Fed. Cl. 13, 19 (2013) and Bayer Corp. & Subsidiaries v. United States, Nos. 09-351 & 08-693, 2012 WL 4339554 (W.D. Pa. Sept. 20, 2012) is misplaced.  These cases stand for the proposition that a plaintiff's failure to provide all relevant facts or evidence as part of the initial administrative claim does not automatically violate the substantial variance rule.  In contrast to Maughan and Yamagata, the plaintiffs in those cases put the IRS on notice of both the subsidiary legal theories and the additional facts that had not been part of their original administrative refund claims.  Thus, both are distinguishable from the case at bar.

legal theory and factual basis supporting plaintiffs' "essential assets" argument varies

substantially from those presented at the administrative phase, IRC § 7422 deprives the

court of jurisdiction to consider plaintiffs' claims based on an "essential assets" theory.[35]

### e. FLPJ exhibited a modified form of free transferability of interests

Finally, plaintiffs argue that FLPJ was not properly taxed as a corporation because

Maughan's and Yamagata's interests in FLPJ were not freely transferable.  Specifically,

they argue that various provisions of FLPJ's Articles of Association, the Settlement

Agreement, and the Settlement Amendment (including the contemporaneously signed

Buy-Sell Agreement and Escrow Instructions) so substantially restricted Maughan's and

Yamagata's right to transfer their interests in FLPJ to third parties that the shares were

effectively not freely transferrable.  The government counters that Japanese law

guarantees free transferability of shares, and that each of the purported restrictions

identified by plaintiffs are either procedurally or substantively invalid, or irrelevant to the

free transferability analysis under the Kintner regulations.  The government further

contends that to the extent there are restrictions on the free transferability of the shares,

those restrictions at most give rise to a modified form of transferability that still weighs in

---

[35] Even assuming that the substantial variance rule did not bar the court from considering
plaintiffs' "essential assets" theory (and assuming that the theory applied), the court would
nevertheless find that FLPJ exhibited the corporate characteristic of limited liability.  Like
the "denial of transaction" rule, the "essential assets" theory does not meaningfully impair the
general and substantial limitation on shareholder liability found in the Japanese Commercial
Code.  Indeed, nothing about the "essential assets" theory would eliminate limited liability as to
FLPJ's torts or contract breaches.  Maughan's and Yamagata's liability under both the "denial of
transaction" and "essential assets" theories was not unlimited: plaintiffs concede that liability
would be limited to the transaction(s) giving rise to the tax deficiency or the profits gained/value
of the essential asset.  See Pls.' Cross-Mot. 34, 36.

favor of treating FLPJ as a corporation under the Kintner regulations.

As discussed below, even assuming that all of the purported restrictions were fully enforceable under both Arizona and Japanese Law,[36] the court finds that FLPJ retained a modified form of free transferability of interests during all relevant tax years, and that this modified form of transferability was sufficiently "free" so as to justify the government's treatment of FLPJ as a corporation for all of the years in question, including the one year that Maughan and Yamagata directly owned shares of FLPJ stock. For the years following the sale of their stock to their holding companies, it is not necessary to find "free transferability" because FLPJ satisfied the tests for treatment as a corporation under the other provisions of the Kintner regulation.  Nonetheless, because a modified form of free transferability did exist for the entire tax period at issue, the government's treatment of FLPJ as a corporation for the entire period is further justified.

### i.  Kintner regulations related to free transferability of interests

With regard to free transferability of interests, the Kintner regulations state:

(1) An organization has the corporate characteristic of free transferability of interests if each of its members or those members owning substantially all of the interests in the organization have the power, without the consent of other members, to substitute for themselves in the same organization a person who is not a member of the organization.  In order for this power of substitution to exist in the corporate sense, the member must be able, without the consent of other members, to confer upon his substitute all the attributes of his interest in the organization.  Thus, the characteristic of free transferability of interests does not exist in a case in which each member

---

[36] The government devoted substantial portions of its briefs arguing that several of these restrictions were procedurally invalid and therefore unenforceable against a bona fide purchaser without notice.  In resolving the parties' cross-motions, the court need not—and does not—address the procedural validity of these restrictions under Japanese law.

can, without the consent of other members, assign only his right to share in profits but cannot so assign his rights to participate in the management of the organization.  Furthermore, although the agreement provides for the transfer of a member's interest, there is no power of substitution and no free transferability of interest if under local law a transfer of a member's interest results in the dissolution of the old organization and the formation of a new organization.

(2) If each member of an organization can transfer his interest to a person who is not a member of the organization only after having offered such interest to the other members at its fair market value, it will be recognized that a modified form of free transferability of interests exists.  In determining the classification of an organization, the presence of this modified corporate characteristic will be accorded less significance than if such characteristic were present in an unmodified form.

26 C.F.R. § 301.7701-2(e) (emphasis added).

      **ii.   None of the agreements between Maughan and Yamagata prevented FLPJ's shareholders from transferring all of the attributes of their interests in FLPJ to each other or a third party at fair market value**

Plaintiffs contend that Maughan's and Yamagata's interests in FLPJ were not freely transferable due to the combined effect of five "restrictions" on the transfer of shares, namely: (1) transfers of plaintiffs' shares required the consent of FLPJ's board ("Board Consent Restriction"); (2) transfers by either plaintiff to a third party triggered the non-transferring party's contractual right of first refusal ("Right of First Refusal Restriction"); (3) upon Yamagata's death, his interests could only be transferred to FLPJ (or ASI) at a specifically designated price ("Transfer at Death Provision"); (4) the special compensation Maughan and Yamagata received based on sales of aloe vera products ceased upon the transfer of their shares ("Termination of Special Compensation Provision"); and (5) the Escrow Instructions, by limiting physical access to the shares,

prevented Maughan or Yamagata from transferring the shares without complying with the other restrictions.

The government responds by first observing that Japanese law generally guarantees free transferability.  Gov.'s Mot. 33 (citing Article 204(1) of the Japanese Commercial Code ("The shares [of a kabushiki kaisha] may be transferred to other person[s].")).  This right, the government asserts, is "forcefully guaranteed" under Japanese law, so as to ensure that shareholders can recover their invested capital.  Id. (citing the Tokyo High Court's decision in Hatahosen KK v. Makiko Hata, 38 TOKOMIN JIHO 4-6 (1987)).  The government further argues that the specific restrictions listed by plaintiffs were either invalid on procedural or substantive grounds, or irrelevant to the free transferability analysis under the Kintner regulations.

As discussed below, the court holds that neither the individual nor cumulative effect of the aforementioned provisions so substantially interfered with Maughan's or Yamagata's modified right to transfer their present interests in FLPJ to another entity for fair market value as to deny FLPJ corporate status.  Accordingly, the restrictions on free transferability discussed below, while amounting to a modified form of free transferability under the Kintner regulations, do not favor plaintiffs, because the restrictions did not amount to a bar on the right of either Maughan or Yamagata (for the period of Yamagata's life) to transfer shares to third parties for fair market value.  Rather, so long as Maughan or Yamagata declined to purchase the other's shares at the fair market price, both plaintiffs were allowed under the agreements to transfer their shares for fair market value to third parties.  Although the restrictions are cumbersome, they did

not foreclose either Maughan's or Yamagata's ability to transfer shares to a third party with all of the rights attributable to them.  For this reason, the shares were sufficiently transferrable to support the treatment of FLPJ as a corporation under the Kintner regulations.  The court addresses each of the restrictions in turn.

### 1. The Board Consent Restriction contained in FLPJ's Articles of Association qualifies as a modified form of free transferability under the Kintner regulations

As noted, FLPJ's share certificates contained a "Restriction on Assignment of Shares," which for all periods relevant to this litigation required that "[a]ny assignment of shares of the Company shall require the approval of the Board of Directors."  1st Stip. ¶ 15.  The government argues that this restriction is irrelevant to the issue of free transferability because, at most, it constitutes a modified form of free transferability of interests.  In particular, the government focuses on the fact that, when a kabushiki kaisha's board of directors denies a transfer request, the Japanese Commercial Code provides a mechanism by which a shareholder can transfer his/her interests to a third party at a court-determined price.[37]  Plaintiffs counter that the alternative sale procedures

---

[37] Article 204-2 (Restriction on transfer of shares) of the Japanese Commercial Code provides as follows:

> [(1)]In the case where the transfer of shares needs the approval of the board of directors, the shareholder desirous to transfer the shares may, by a document stating the other party of transfer as well as the class and number of the shares to be transferred, request that the company should approve the transfer, or request that it should designate another party of transfer unless it approves the transfer.
> . . .
> (3) If . . . the transfer is disapproved, the board of directors shall designate another party of transfer.
> . . .

in the Japanese Commercial Code do not reliably arrive at a fair market value because not all Japanese courts use the same method to determine the sale price.  Pls.' Reply 8 (citing Masahiro Kitzazawa, 211 Company Law, (4th ed., 1994) ("The calculation method[s] vary including Net Assets Value method, method comparing to a similar type of business, Revenue [R]eturn [M]ethod, Dividends [R]eturn [M]ethod, and method[s] combining multiple of those methods.")).  As such, plaintiffs contend that the Board Consent Restriction prevents FLPJ's shares from exhibiting the characteristic of free transferability.

---

Article 204-4 (Determination of buying and selling price) provides:

> [(1)] If . . . no agreement has been reached [between the designated buyer and the seller] as to the buying and selling price, the concerned parties may . . . apply [to] the court for determining the buying and selling price.
> (2) The court shall, in making the determination . . . take in consideration the assets condition of the company at the time of the request [of purchase] . . . and all other circumstances.
> . . .
> (4) The transfer of shares shall become effective as from the time of the payment of the proceeds.
> . . .

Finally, Article 204-5 (Request for designation of preemption right owner, from acquirer) provides:

> In the case where the approval of the board of directors is needed for transferring the shares, the person who has acquired the shares may, by a document stating the class and number of the shares, request the company to designate a person who is to buy the shares in the event that the company does not approve the acquisition. In this case, the provisions of Article 204-2 paragraph 3 or 4 and the preceding two Articles shall apply mutatis mutandis.

The above-quoted provisions appear in substantially similar form in both the 1991 and 1995 versions of the Japanese Commercial Code.  The primary difference in the 1995 version of the code is that it includes additional provisions to allow, and set the price for, shares that the company repurchases.

The court finds that because the Japanese Commercial Code's judicially-managed sale mechanism guarantees a sale price that is intended to approximate fair market value, the Board Consent Requirement is consistent with a modified form of free transferability under 26 C.F.R. §301.7701-2(e)(2).[38]  Plaintiffs' argument—that Japanese courts cannot achieve a fair market value because they use different methods to arrive at sale prices of kabushiki kaishas—is unpersuasive.  As the Federal Circuit observed in Okerlund v. United States, "the valuation of a closely held company is an inexact science (some might say an art), and relevant probative evidence should never be ignored."  365 F.3d 1044, 1052 (Fed. Cir. 2004).  Thus, in the context of calculating taxes on a gift of closely-held stock, it was appropriate to value stock by considering "the company's net worth, earnings potential, capacity to pay dividends, and other relevant factors."  Id. at 1050 (listing additional relevant factors including, among others, the dividend-paying capacity of the company, market price of freely traded stocks of corporations engaged in similar lines of business, and discounts to reflect the stock's lack of marketability or voting rights).

As noted, Article 204-4(2) of the Japanese Commercial Code states that a court "shall, in making the determination [as to the sale price] . . . take in consideration the assets condition of the company at the time of the request [of purchase] . . . and all other circumstances."  The fact that Japanese courts have considered multiple factors—many of

_____

[38] In light of the judicially-managed sale procedures in the Japanese Commercial Code, the court does not reach the parties' arguments concerning whether the fiduciary duties of FLPJ's directors prevented them from unreasonably denying consent.

which were exactly the same as those endorsed in <u>Okerlund</u>—does not mean that a judicially-managed sale is inconsistent with a proper fair market value analysis.  For these reasons, the court concludes that the Board Consent Restriction constituted a modified form of free transferability under 26 C.F.R. § 301.7701-2(e)(2).

### 2. The Right of First Refusal Restriction preserved a modified form of free transferability

As discussed above, if Maughan or Yamagata desired to sell his shares to a third party, Article 4 of the Settlement Agreement required the seller to first provide the non-selling shareholder with what amounted to a 30-day option to purchase all of his shares in FLPJ at a specified price.  <u>See</u> 1st Stip. Ex. 6 at 16-17.  If the non-selling shareholder either failed to accept the offer (or failed to perform after having accepted), then the offeror was free, for a period of seven months, to sell his FLPJ stock to any third party at a price and on terms no more favorable than those offered to the non-selling shareholder. <u>See</u> <u>id.</u> at 19-20.

The government argues that the Right of First Refusal procedures found in Article 4 of the Settlement Agreement is wholly consistent with the modified form of free transferability found in the Kintner Regulations.  Specifically, the government argues that a shareholder would first negotiate with the market to establish a sales price for the shares, and then give the non-selling shareholder an opportunity to match that price under the right of first refusal.  Plaintiffs read Article 4 differently.  In particular, plaintiffs understand these provisions as prohibiting a shareholder from negotiating with the market (in order to arrive at a market price) until <u>after</u> he first makes a written offer to the non-

47

selling shareholder.  Pls.' Cross-Mot. 24.  Plaintiffs also contend that the Article 4's

consent requirement presented more onerous restrictions on transferability than the

restriction that destroyed free transferability in MCA, Inc., 685 F.2d at 1102.[39]

The court does not discern any meaningful difference between the procedures in

Article 4 of the Settlement Agreement and the modified form of free transferability

described in the Kintner regulations.  See 26 C.F.R. § 301.7701-2(e)(2) (modified form of

free transferability exists "[i]f each member of an organization can transfer his interest to

a person who is not a member of the organization . . . [only] after having offered such

interest to the other members at its fair market value").  Plaintiffs' contention that the

Settlement Agreement required an FLPJ shareholder to abstain from negotiating with the

market prior to making a written offer to the other shareholder—in effect, to willfully

blind himself—is not supported by the terms of the agreement.

Equally meritless is plaintiffs' reliance on MCA.  First, unlike here, the parties in

MCA stipulated that the company lacked free transferability of interests because consent

was required from multiple parties to effect a transfer—the only issue was whether the

consent requirement could be ignored under a constructive ownership/control theory.  See

MCA, Inc., 685 F.2d at 1102 (rejecting argument that provisions purporting to restrict

transferability of interests had no legal significance because companies purportedly

represented a single economic interest).  Second, MCA involved an absolute bar on

---

[39] In MCA, Inc., the subject entity's organizational documents and local law governing certain
distribution outlets "provide[d] that no member may transfer, pledge or in any way burden its
interest in the outlet without the approval of the other member . . . ."  MCA, Inc. v. United States,
502 F. Supp. 838, 843 (C.D. Cal. 1980) rev'd, 685 F.2d 1099.

transfer without consent, which was plainly not the case under the Settlement Agreement

or Buy-Sell Agreement.  As previously discussed, the Settlement Agreement and Buy-

Sell Agreement incorporated a Right of First Refusal, which enabled Maughan and

Yamagata to transfer their shares to a third party on terms no more favorable than those

previously offered (and rejected) by the other shareholder.  In short, the facts in MCA are

plainly distinguishable from the facts in this case on the issue of free transferability.

### 3. The Transfer at Death Provision did not constitute a restriction on Yamagata's right to freely transfer his then-present interest in FLPJ to a third party

The Buy-Sell Agreement provided that ASI[40] agreed to purchase, and Yamagata

(or his transferees and assigns) agreed to sell, all of Yamagata's stock in FLPJ for

$10,000,000 upon Yamagata's death.[41]  In addition, if Yamagata sought to sell or transfer

---

[40] Because, as plaintiffs concede, at the time the parties entered into the Settlement Agreement Japanese law did not allow a kabushiki kaisha to reacquire its own shares, for the purpose of this motion the court only considers the Transfer at Death Provisions as of date the Buy Sell Agreement was ratified (i.e., October 13, 1992).  See supra note 15; Japanese Commercial Code Article 210 (1991) ("A company cannot acquire its own shares . . . .").  However, even if the court were to consider the Transfer at Death Provisions during the period prior to ratification of the Buy-Sell Agreement, for the same reasons discussed, infra, the court would still conclude that the Transfer at Death Provision did not affect the free transferability of FLPJ.

[41] Section 3.1 of the Buy-Sell Agreement provided, inter alia:

> [I]n the event of the death of Yamagata, . . . [ASI] shall . . . purchase the following: all the shares of [ASI] Stock . . . owned by Yamagata or by any transferee of Yamagata as a result of a Permitted Transfer . . . and (b) all of the shares of stock of FLP[J] owned by Yamagata Holding from Yamagata Holding or any successor (the shares to be purchased are collectively referred to as "Yamagata Stock") . . . .

> [I]f, prior to Yamagata's death, Yamagata Holding has sold all of the FLP[J] stock owned by it to a third-party [sic] other than Rex Maughan, his heirs, devisees or any other entity in which he has interest, the obligation to sell the FLP[J] stock herein shall be assumed by the purchaser subject to the terms of

his shares to a third party, he was required to obtain the transferee's consent to be bound to this same stock buy-back provision.  The government argues that these requirements did not constitute a meaningful restriction on Yamagata's right to transfer all of the attributes of his interest in FLPJ to a third party.  In response, plaintiffs argue that the Transfer at Death Provision constituted a substantial restriction on transferability because it purportedly limited the transfer of shares to a fixed, non-market value price and to a specific transferee.

The court agrees with the government that the Transfer at Death Provision did not meaningfully restrict the capacity of FLPJ's shareholders to transfer the attributes of their interests in the company to a third party.  In reaching this conclusion, the court begins by identifying the three important attributes of Yamagata's 9,000-share interest in FLPJ: (1) the right to vote at FLPJ's shareholder meetings for the duration of Yamagata's life; (2) the right to receive dividends for the duration of Yamagata's life; and (3) the right to a future payment of $10,000,000 upon Yamagata's death, in exchange for the FLPJ share

---

> Article 4 of the Settlement Agreement, and upon Yamagata's death his estate . . . shall assign all the [ASI] Stock in which Yamagata has an interest to Maughan upon the payment of: (1) all amounts due Yamagata under his employment agreement with [ASI] at the date of Yamagata's death, and (2) a distribution of an amount of dividends due with respect to Yamagata's stock in [ASI] . . . .

1st Stip. Ex. 21 at 5.  Section 3.2 further provided that:

> Subject only to the exception permitted under Article 4 of the Settlement Agreement, as subsequently amended, within sixty (60) days after the date of Yamagata's death, his legal representative or the escrow agent holding the Yamagata Stock, as the case may be, shall render the Yamagata Stock for sale to [ASI.]  . . . The purchase price for the Yamagata Stock will be ten million dollars ($10,000,000) payable in cash at closing.

certificates.  As explained below, nothing about the Transfer at Death Provision interfered with the ability of Yamagata (or any of his transferees) to transfer any of these attributes to a third party.

The court agrees with plaintiffs that the measure of modified transferability under the Kintner regulations is that plaintiffs are entitled to a transfer price that is at least substantially similar to fair market value.  Plaintiffs' are wrong, however, to assert that the fixed-nature of the $10,000,000 death-payment constitutes evidence that Yamagata's interests were not freely transferable.  Plaintiffs err by focusing on the fixed nature of the $10,000,000 lump-sum payment, rather than on whether the Transfer at Death Provision restricted Yamagata's (or his transferee's) ability to obtain a fair market value for the bundle of attributes associated with Yamagata's interests.

Because Yamagata's beneficial interest would have terminated upon his death, it is the value associated with pre-death transfers—not the lump sum payment upon death— that is relevant for purposes of the free transferability analysis.  The record reflects that the lump-sum payment would have only constituted a fraction of the market value of Yamagata's shares.  Per-shareholder dividends exceeded $1,000,000 on multiple occasions during the tax years in question, and the parties to the Settlement Agreement expected Yamagata to live another 23 years beyond 1990.  See 1st Stip. Ex. 6 at 24-25.  It follows that a rational third-party purchaser would offer to the holder of Yamagata's shares a price that reflected the risks and opportunities associated with shares whose beneficial attributes—including the right to receive dividends and vote at shareholder meetings—terminated upon Yamagata's death.  Even the right to a future payment of

$10,000,000 upon Yamagata's death would be susceptible to market valuation. Accordingly, the court concludes that the Transfer at Death Provision did not constitute a substantial restriction on the free transferability of interests in FLPJ.

### 4. The Termination of Special Compensation Provision did not constitute a restriction on Maughan's or Yamagata's right to freely transfer attributes of their interests in FLPJ

As noted above, in addition to millions of dollars in FLPJ dividends, Maughan and Yamagata also received compensation in the form of salary, commissions, and royalties by virtue of their relationships with FLPJ and AVA.  Plaintiffs rely on Section 3.2 of the Settlement Agreement as evidence that this additional compensation also constituted "attributes" of their ownership interests within the meaning of the Kintner regulations.[42] Plaintiffs then urge the court to conclude that because sections 4.2.2 and 6.2 of the Settlement Agreement terminate a selling shareholder's right to receive such salary, commissions, or royalties, that Maughan and Yamagata are unable to freely transfer all of the attributes of their ownership interest in FLPJ.  For its part, the government contends that salaries, commissions and royalties are not attributes of Maughan's or Yamagata's ownership interests, and are therefore irrelevant to the free transferability analysis under the Kintner regulations.

As explained, supra, the attributes of Maughan's and Yamagata's interests in FLPJ

---

[42] Section 3.2 provides, inter alia: "Yamagata and Maughan agree that . . . with respect to transactions with FLPJ, all compensation for services, commissions, royalties, and any and all other income or economic benefit derived by them or their affiliates in connection with the operations of FLPJ shall be equal as between Maughan and Yamagata . . . ."  1st Stip. Ex. 6 at 14.

consisted of (1) the right to vote at FLPJ's shareholder meetings; (2) the right to receive dividends; and, in the case of Yamagata's shares, (3) the right to a future payment of $10,000,000 upon Yamagata's death in exchange for his share certificates.  By contrast, the additional "attributes" identified by plaintiffs were the product of a settlement agreement that both limited Yamagata's ownership interests in FLPJ (by essentially reducing his interest in FLPJ's shares to a life estate in exchange for a lump sum payment upon his death) and arranged for special "compensation for services, commissions, royalties . . .  in connection with the operations of FLPJ."  1st Stip. Ex. 6 at 14 (emphasis added).  Thus, the special compensation Maughan and Yamagata received was not derivative of their ownership interests in FLPJ, per se.  Rather, these were paid because of the special relationship between FLPJ and a third party: AVA.  As such, the court concludes that the inability of Maughan or Yamagata to transfer the right to such special compensation is not relevant to the analysis of free transferability under the Kintner regulations.

### 5. The Escrow Instructions were merely an enforcement mechanism of the other restrictions and therefore did affect the transferability of the plaintiffs' interests in FLPJ

Because Article 205 of the Japanese Commercial Code provides that "[f]or transferring the shares, the share certificates are required to be delivered," a shareholder's access (or lack thereof) to the physical share certificates is relevant to the issue of free transferability.  Under the terms of the Escrow Instructions, Yamagata deposited his share certificates with an escrow company with instructions not to release them unless, inter alia, the agent was presented with a sworn notarized statement by both Maughan and

Yamagata that either (1) they both desired to make a transfer in accordance with the requirements of the Buy-Sell Agreement or (2) the Buy-Sell Agreement had been terminated.  1st Stip. Ex. 22 at 2-3.

The government contends that the Escrow Instructions either were redundant with the Right of First Refusal Restriction or were substantively invalid under Japanese law because, by denying Yamagata access to his shares, the Escrow Instructions constituted a complete prohibition on transferability.  Plaintiffs describe the Escrow Instructions, by requiring proof that the parties had complied with the various agreements, as "not a complete prohibition on the transfer of shares; rather, [they are] merely a mechanism guaranteeing that the terms of the [Settlement Amendment] and the Buy-Sell Agreement are enforced."  Pls.' Cross-Mot. 29.

The parties appear to agree that the Escrow Instructions merely served as a redundant "restrictive layer" to ensure that the various agreements between the parties would be followed.  Pls.' Cross-Mot. 29.  The court agrees with this assessment,[43] and because, as explained above, none of the agreements between Maughan and Yamagata destroyed the modified form of free transferability contemplated by the Kintner regulations, the court is left to conclude that the Escrow Instructions did not constitute a restriction on the free transferability of plaintiffs' interests in FLPJ.

The government is entitled to summary judgment with regard to the free

---

[43] Because the court agrees with the parties that the Escrow Agreement primarily served as an enforcement mechanism for the other agreements, the court does not reach the government's alternative argument that the Escrow Instructions would have been void under Japanese law as a total bar on transferability.

transferability under the Kintner regulations.

## III.    CONCLUSION

Based on the foregoing discussion of the undisputed facts, the court concludes as a matter of law that for all of the relevant periods, FLPJ exhibited at least three (and after 1992, all four) of the attributes of a corporation identified in the Kintner regulations, including: centralized management,[44] limited liability, a modified form free transferability of interests, and continuity of life.  Accordingly, the court holds that FLPJ more closely resembled a corporation than a partnership, and was therefore properly taxed as a corporation during the years at issue in this case.  The government's motion for summary judgment is **GRANTED**, and the plaintiffs' cross-motion is **DENIED**.  The clerk is directed to enter judgment accordingly.  Each party to bear its own costs.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[44] As discussed, supra, FLPJ did not exhibit centralized management for a brief period prior to October 23, 1992.